**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **COMASIO PASTORE,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **06 C 4627** |
| | ) | |
| **MICHAEL ASTRUE, Commissioner of** | ) | |
| **the Social Security Administration,** | ) | |
| **Defendant.** | ) | |

**MEMORANDUM AND ORDER**

Plaintiff Comasio Pastore brings this action pursuant to 42 U.S.C. § 405(g) to review the

final decision of the Commissioner of the Social Security Administration denying his claim for

disability insurance benefits under the Social Security Act, 42 U.S.C. § 1381 *et seq.* For the

reasons set forth below, Mr. Pastore's motion for summary judgment is granted, the decision of

the Commissioner is reversed, and this case is remanded for further proceedings consistent with

this order.

**I.      Background**

**A.      Procedural History**

Mr. Pastore filed his application for Disability Insurance Benefits ("DIB") on December

10, 2002, alleging an onset of disability of September 21, 2002, due to heart problems, fatigue,

shortness of breath and an inability to lift. His date last insured (the date by which Mr. Pastore

must establish disability in order to be eligible for DIB, 20 C.F.R. § 404.131) is December 31,

2007. After his claim was denied initially and on reconsideration, Mr. Pastore requested a

hearing. Administrative Law Judge ("ALJ") Richard Boyle held a hearing and issued an

unfavorable decision. Mr. Pastore filed a Request for Review and the Appeals Council remanded the claim. The ALJ held a second hearing and again issued an unfavorable decision. Mr. Pastore filed a request for review, which was denied, leaving the ALJ's decision as the final decision of the Commissioner.

### B. Facts

#### 1. Mr. Pastore's Testimony

At the time of the ALJ's decision, Mr. Pastore was 54 years old. Although one document supporting his application shows he completed grade twelve and received special training, another document shows he completed only grade eight in Italy, and Mr. Pastore states in this case that he completed eighth grade in Italy. Administrative Record ("AR") at 141, 484; Reply at 9-10. At the hearing, he testified he had five years of formal education in Italy and explained that he had received formal training and certification in Italy in automobile mechanics. Mr. Pastore worked as a mechanic for his entire career and owned an automobile garage servicing transmissions.

Mr. Pastore testified that since September 21, 2002, he has felt weak and has slept "all the time." AR at 601. He does not sleep well at night, which causes fatigue and the need to nap during the day. A CPAP machine was prescribed for sleep apnea, but he was unable to use it because it made him feel like he was choking. After his heart surgery, he began to feel nervous and have panic attacks. During those attacks, he lost feeling in his arms and legs.

He also had difficulty in crowds. In addition, he could not finish work under a deadline because of the pressure. What he once was able to complete in one hour would now take days. He could only walk about 1½ to 2 blocks slowly due to difficulty breathing, and could not sit

more than 20 minutes in one position. Climbing two or three steps caused heavy breathing. He could stand for about 30 minutes at one time, but would need to move, and could stand for a total of two to three hours throughout a workday.

He experienced sharp pain in his lower back that occurred almost every day. He suffered pain and swelling in his right knee, and he needed to elevate the leg two to three times a day. Lifting caused pain in his chest and shortness of breath. He could not lift more than ten pounds. He had difficulty dressing, and could not bend down which made putting on socks and shoes difficult.

He was prescribed Effexor (for depression), Lisinopril (an angiotensin converting enzyme or "ACE" inhibitor, used to treat high blood pressure and heart conditions), Atenolol (a beta-blocker which affects blood flow and is used to treat high blood pressure and heart conditions), Lipitor (a cholesterol-lowering medication), Flomax (a medication which relaxes veins and arteries so blood can more easily pass through them which is also used to treat prostate disease), aspirin (presumably low-dose aspirin, used to help prevent heart attacks and strokes), nitroglycerin (a vasodilator used to treat heart conditions), and Proscar (used to treat prostate disease).

> ## 2. Medical Evidence

In 2001, Dr. Webb, Mr. Pastore's treating physician, diagnosed chest pain, myocardial infarction and performed angioplasty. Dr. Webb noted complaints of chest pressure radiating to both upper extremities, chest pain, and dyspnea. Mr. Pastore's ECGs were abnormal with marked sinus bradycardia and ST and T wave abnormality. Dr. Johnson diagnosed coronary artery disease with descending artery lesion and hyperlipidemia.

In October of 2001, Mr. Pastore underwent a successful angioplasty and stenting to the right coronary artery (a procedure for elimination of areas of narrowing in blood vessels). In November of 2001, he was admitted to the hospital for chest pain and underwent a second angioplasty with stenting to the left coronary artery.

On July 17, 2002, Mr. Pastore went to the emergency room and was admitted for chest pain, weakness, myalgias (muscle pain), and paresthesias (a neurological condition which causes numbness and tingling). X-rays of Mr. Pastore's chest were normal, he had an unremarkable stress test, a chest electrocardiogram showed normal sinus rhythm, and Mr. Pastore's chest pain appeared related to an upper respiratory tract infection. He was diagnosed with chest pain, non-cardiac, and coronary artery disease, status post-angioplasty.

In a November 7, 2002 appointment, Dr. Webb assessed shortness of breath, anxiety or stress, and coronary artery disease. Pulmonary function testing on December 9, 2002, showed normal spirometry and attributed decreased flows post-bronchodilator to poor effort.

In 2003, an MRI of the brain revealed chronic periventricular and subcortical lacunar infarcts.[1] Dr. Bajgrowicz, a treating physician, diagnosed anxiety disorder, neuropathy with shooting pain, and coronary artery disease. X-rays revealed mild cardiomegaly with minor increased interstitial markings at the lung bases. Dr. Webb diagnosed sleep apnea, headaches, fatigue, dyspnea, weakness, hand edema, left side weakness and coronary artery disease. He noted complaints of feeling weak and dizzy, occasional chest pain, shortness of breath and weakness on the left side.

---

[1] A lacunar infarct occurs when small intracranial vessels are blocked. This may often lead to a stroke.

Dr. Gries, another treating physician, diagnosed obstructive sleep apnea, leg weakness, chest pain, myalgias, and coronary artery disease. He noted complaints of chronic left chest ache and shortness of breath. A sleep study revealed that Mr. Pastore had obstructive sleep apnea and that even with a CPAP machine, he still had sleep fragmentation and numerous spontaneous arousals. Doctors noted his excessive daytime sleepiness and recommended that he not sleep on his back. Mr. Pastore scored 15 on the Epworth Sleepiness Scale which his doctors described as "quite elevated." AR at 323. His doctors also noted complaints of loud snoring, observed apneas, and daytime fatigue.

On February 13, 2003, Jesal S. Patel, M.D., examined Mr. Pastore at the request of the state agency. After performing a consultative exam, he made normal findings after examining Mr. Pastore's chest, lungs, and heart. Mr. Pastore had crepitus (crackling) in both knees and intact range of movement. Spinal examination showed no midline or paraspinal tenderness with straight-leg raises restricted to 70 degrees bilaterally. He walked with a normal gait. Dr. Patel observed Mr. Pastore had mild difficulty getting on and off the table and tandem walking, and noted that Mr. Pastore could not walk, stand, or climb stairs without dyspnea or dizziness. His neurological examination was normal except for decreased pinprick sensation in his right heel. Dr. Patel also found that Mr. Pastore was alert and fully oriented, he remembered his address and his medical history, and he had normal speech and affect. Ultimately, he diagnosed exertional dyspnea, coronary artery disease, anxiety, and generalized weakness and fatigue.

On February 27, 2003, state agency physician Virgilio Pilpail, M.D. opined that Mr. Pastore could lift 20 pounds occasionally and 10 pounds frequently, stand and/or walk for about 6 hours in a workday, sit for about 6 hours in a workday and limited him to light work. This

assessment was approved on April 30, 2003, by what appears to be another state agency physician.[2]

On April 2, 2003, Dr. Webb conducted magnetic resonance imaging (MRI) of the brain to assess malaise and fatigue. The MRI showed "evidence of scattered chronic periventricular and subcortical chronic lacunar infarcts [and] no other abnormality." AR at 339. The report also noted a clinical history of cerebrovascular disease and left-sided weakness. Polysomnographic evaluation (*i.e.*, a sleep study) on May 23, 2003, showed Mr. Pastore suffered from obstructive sleep apnea and he was told to consider using a C-PAP machine. On April 22, 2003, Dr. Webb diagnosed questionable dyspnea (shortness of breath due to disease of the airway, lungs, or heart) and probable sleep apnea.

On June 13, 2003, Dr. Gries diagnosed coronary artery disease ("CAD") and myalgias and possible obstructive sleep apnea ("OSA").[3]

On July 4, 2003, Mr. Pastore was admitted to the hospital after having left side chest pain and shooting pain from his neck to feet. A chest X-ray showed minimal cardiomegaly with no active infiltrates (an enlarged heart with no materials which have penetrated its interstices). While at the hospital, Mr. Pastore underwent a consultation with Kevin McCoyd, M.D., for his complaint of electric-like sensations in his body when he moved. Dr. McCoyd made normal neurological findings "despite his multiple complaints." AR at 254. Dr. McCoyd stated Mr. Pastore had no symptoms suggesting cervical cord lesion and that a previous MRI and

---

[2] Due to the stereotypically illegible handwriting of the approving state agency physician, the identity of this doctor is unclear.

[3] The court accepts counsels' description of this diagnosis as regrettably, it cannot decipher Dr. Gries' handwriting.

electroencephalogram were normal. Dr. McCoyd diagnosed sleep apnea and recommended discharge from a neurological standpoint, but noted that Mr. Pastore's regular physician might consider ordering an electromyography (EMG, a test which evaluates and records physiologic properties of muscles at rest and while contracting) and a MRI of Mr. Pastore's cervical spine.

On July 7, 2003, Dr. Webb, diagnosed sleep apnea and coronary artery disease (CAD). The following day, Dr. Gries recommended a stress test to assess his chest pain and a neurological evaluation to assess his leg weakness. On September 8, 2003, Mr. Pastore underwent a sleep study and experienced successful use of a C-PAP machine while sleeping.

In 2004, Mr. Pastore had a consultative psychological evaluation with Dr. Peggaue, a licensed clinical psychologist. During the evaluation, Mr. Pastore described his typical day, which included waking at 7:30 a.m., taking a 30 to 60 minute morning walk, going to his transmission shop with his son, where he took a couple naps; returning home and taking an afternoon walk, and driving and going to the shopping center with his wife. Dr. Peggau made essentially normal mental status examination findings and concluded Mr. Pastore could understand, remember, and carry out semi-complex and simple instructions; interact appropriately with co-workers, supervisors and the public; and was fairly cooperative. Dr. Peggau did not diagnose Mr. Pastore with a mental impairment and assessed his current and highest global assessment of functioning (GAF) score as 90 ("absent or minimal symptoms . . . good functioning in all areas." Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. 2000). Dr. Peggau also opined, based on the normal mental status findings, that Mr. Pastore had no mental limitations on his ability to perform work-related activities.

On April 11, 2005, Mr. Pastore went to the emergency room reporting he had a "panic

attack," after becoming upset and hyperventilating that evening. AR 432, 535. He was treated by Dr. McKee, who found that upon examination, Mr. Pastore was awake, alert, cooperative, fully oriented, and had a calm affect and coherent speech. Mr. Pastore was anxious upon neurologic examination, but was otherwise normal, and X-rays of his chest were also normal. He was diagnosed as having anxiety/panic attack and was discharged.

In May of 2005, Dr. Gries opined that Mr. Pastore could occasionally and frequently lift 10 pounds, stand and/or walk for less than 2 hours in a workday, sit for less than 6 hours in a workday, was occasionally limited in climbing, balancing, stooping, kneeling, crouching, and crawling, was limited in near acuity and his ability to push and pull using his lower extremities, should avoid all exposure to extreme cold, extreme heat, fumes, odors, dusts, gases, and hazards. This was based on diagnoses of hypertension, coronary artery disease, and sleep apnea.

On June 21, 2005, Dr. Conran performed a consultative psychiatric exam at the request of the Administration. He noted that Mr. Pastore stated that he had been diagnosed with sleep apnea but was not able to tolerate a CPAP machine. Dr. Conran observed that Mr. Pastore appeared to be short of breath, that his mood was sad and tired, and that his stream of conversation was rather slow and low volume. Dr. Conran diagnosed Mr. Pastore with major depression and a history of coronary artery disease.

In addition, on June 21, 2005, Mr. Pastore saw Dr. Velis, an internist, who performed another consultative exam at the request of the Administration. Dr. Velis noted complaints of fatigue, malaise, occasional chest pain with panic attack, and shortness of breath during activities of daily living. Dr. Velis also noted Mr. Pastore's history of coronary artery disease and his report that his occasional chest pain was usually associated with a panic attack. He also noted

problems of hypertension, hyperlipidemia, and, based on Dr. Conran's psychiatric consult, depression/anxiety/panic. He made normal lung, cardiac, and neurological findings and found that Mr. Pastore showed full range of motion of all joints. Ultimately, Dr. Velis diagnosed coronary artery disease with occasional chest pain usually associated with a panic attack, hypertension, hyperlipidemia, depression, anxiety, and panic.

On July 6, 2005, state agency physician Young-Ja Kim, M.D., reviewed the record to conduct a physical residual functional capacity assessment. He opined Mr. Pastore could occasionally lift 50 pounds, frequently lift 25 pounds, stand/walk or sit for about 6 hours each in an 8-hour day, and had no environmental limitations. Dr. Kim noted that a treating source opined Mr. Pastore had a residual functional capacity which only allowed him to perform less than sedentary work, but stated that the opinion was not supported by evidence.[4]

On July 25, 2005, state agency psychological consultant Glen Pittman reviewed the record and filled out a form indicating that Mr. Pastore did not have a medically determinable impairment that satisfied the diagnostic criteria for Listing 12.04 for depressive disorders. He went on to assess the "B" criteria of the applicable listing and checked a box indicating that Mr. Pastore had mild restrictions of activities of daily living, difficulties in social functioning, and concentration, persistence and pace, and no episodes of decompensation. He then checked a box indicating that Mr. Pastore did not have a severe mental impairment.

In the single paragraph explanation supporting his conclusions, the consultant stated:

---

[4] This opinion was drawn from Dr. Kim's rather cryptic assessment of the contrary medical evidence in the record, which in its entirety states that "RIF, less than sedentary RFC; not supported by the evidence in file." AR at 570. Dr. Kim also noted that Mr. Pastore reported symptoms of fatigue, malaise, and chestpain, but was atypical for angina and had unremarkable clinical findings.

54 y/o male.  8th grade in Italy, mechanic until 9/02.  Prior denial 10/04.  He
alleges CAD with documentation.  Hospital/OP care since 2002 when MI with
subsequent PTCA– no further tx other than routine monitoring of progress.  He
continues to c/o SOB with fatigue, sometimes chest pain, plus recent dx sleep
apnea.  He has been depressed/anxious since cardiac illness, no indication of sx
prior to the medical problems.  No psychiatric tx, PCP prescribes Effexor 150 mg
which is beneficial.  Psych CE dx MDD but secondary depression is probably
more accurate.  Main complaints are fatigue, diminished conc although daughter
relates that his memory and concentration are mostly good.  MSE showed intact
memory, clear sensorium, no thought disorder, no SI, sad affect.  Clmt also notes
a shortened attention span, diminished sleep – whether using CPAP?  Daughter
describes anxiety attacks but of an infrequent nature.  He continues to drive, leave
home alone daily, is social, does some reading, attends church.  The affective sx
are not severe.

AR at 584.

On September 29, 2005, Dr. Bhagwakar (an internist) performed a consultative exam at

the request of the Administration.  He noted that x-rays of the right knee revealed early

degenerative disease and x-rays of the lumbar spine revealed degenerative disc disease between

L4-5 and L5-S1, and osteoporosis.  Dr. Bhagwakar opined that Mr. Pastore could lift less than 10

pounds occasionally and less than 5 pounds frequently, but noted that there were no medical

findings to support these limitations and that the limitations were based on Mr. Pastore's history.

He also opined that Mr. Pastore could never climb, balance, kneel, crouch, crawl or stoop.  In

addition, Dr. Bhagwakar noted that Mr. Pastore complained of dyspnea but no pain upon walking

a couple of steps, difficulty lifting objects, that he used a cane to walk (but had no difficulty with

gait at his appointment and did not bring a cane with him), and that he had intermittent swelling

of the hands and feet.  He diagnosed a history of chronic fatigue with dyspnea, a history of right

knee pain (although on the date of his examination, Mr. Pastore had a full range of motion with

no subjective findings), a history of low back pain (although again on the date of his

examination, Mr. Pastore had a normal range of motion with no subjective findings) and a history of coronary artery disease.

### 3.    Testimony of Dr. John Cavenagh (Medical Expert)

The medical expert, Dr. John Cavenagh, reviewed Mr. Pastore's medical records and testified as follows:  Medical evidence corroborated diagnoses of coronary artery disease with stents, sleep apnea, chronic anxiety with depression, panic attacks associated with shortness of breath, a sense of fatigue and a history of pain in the back and legs.  X-rays revealed early degenerative disease of the right knee and degenerative disc disease at L4-5 and L5-S1.  There was also evidence of osteoporosis.  Dr. Cavenagh concluded that there was no evidence of significant functional limitation in the record due to heart, lung, or skeletal disease, but that "[a]nxiety attacks appear to be a major impairment."  AR at 616.

As noted above, Dr. Gries limited Mr. Pastore to lifting less than 10 pounds frequently. Dr. Cavenaugh stated that he was "not in a position to agree or disagree with the assessment" but would not "argue with it."  AR. at 620.  He opined that it was not uncommon for a person who lifted a lot during his lifetime to develop back or knee arthritis.  Limitations in bending would not be uncommon with low back pain and the limitation may be due to the pain itself or the arthritic changes.

Dr. Cavenagh testified that Mr. Pastore did not have any significant functional limitations due to heart, lung, or skeletal disease.  In addition, in noting that while "[a]nxiety attacks appear to be a major impairment[,]" he also stated that anxiety was a "somewhat common residual of a heart attack" and testified that it was not well-documented here.  AR at 616-17.

Dr. Cavenagh testified that Mr. Pastore's heart function has been good and that "psychological reverberations from heart disease" probably "played [a] role" in his emotional condition. AR at 624.

### 4. Testimony of Pamela Tucker (Vocational Expert)

Pamela Tucker, the vocational expert, testified that Mr. Pastore's past relevant work was as a mechanic and would be classified as skilled and medium in exertion under the Dictionary of Occupational Titles ("DOT"). As he performed this job, however, it was heavy in exertion. She stated that he had acquired transferable skills "as far as mechanics and repairs of transmissions and thing like that." AR at 628.

Ms. Tucker then considered the following hypothetical question: what if Mr. Pastore had the ability to perform medium work, could not climb ladders, ropes or scaffolds, and could occasionally climb stairs, ramps, balance, stoop, kneel, crouch and crawl? She opined that with these restrictions, Mr. Pastore could perform semi-skilled work as an auto service writer (4,000 in region), parts counter person (2,000 in region), and an auto technician who performed minor inspections and made minor repairs but did not engage in repetitive work (8,000 in region). He could not, however, perform his past work because of the lifting requirements.

Ms. Tucker then considered another hypothetical question: what if Mr. Pastore had the ability to perform light work with the same restrictions as above? She stated that he could not perform his past relevant work but could perform light, semi-skilled work as an auto cost estimator (3,000 in region), auto technician (8,000 in region) and parts counter person (3,000 in region).

Ms. Tucker also considered the job opportunities open to an individual limited to sedentary work with the same restrictions as the first hypothetical question and no limitation for deadlines. She opined that such an individual could perform work as a cashier, information clerk, or telephone quotation clerk.

A high school diploma is required for work as a service writer, estimator and parts counter. None of the jobs listed by Ms. Tucker would allow naps during the day. Finally, none of the jobs at the medium or light exertional level are available to individuals who could not handle production deadlines.

### 5.        The ALJ's Decision

In the narrative portion of his decision, the ALJ found that it was significant that Dr. Patel, while noting a positive straight leg raising test, did not make a diagnosis of a knee condition. AR at 26 ("The medical expert testified that the record does not reflect any functional limitations, and despite these x-rays, no formal musculoskeletal impairment has been diagnosed, nor does he receive treatment of any sort for such condition. Since he has no diagnosed musculoskeletal impairment that has been shown to impact his ability to lift, carry, stand, walk, sit, push, or pull, he cannot be found to have a severe musculoskeletal impairment").

The ALJ then turned to Mr. Pastore's history of coronary artery disease, sleep apnea, and depression and anxiety, stating that the medical expert had not found that these impairments were severe enough to meet or medically equal, either singly or in combination, any of the Listings. Thus, he considered whether Mr. Pastore's residual functional capacity allowed him to perform his past relevant work or other work existing in significant quantities in the national ecomony.

In this regard, the ALJ accepted the medical expert's testimony that Mr. Pastore's coronary artery disease was stable and that his chest pain issues stemmed from emotional rather than cardiac problems.  The ALJ also stated that based on Drs. Peggau and Conran's evaluations and Dr. Bhagwakar's 2005 report, Mr. Pastore's mental limitations were not severe and did not result in work-related limitations.

The ALJ also found that Mr. Pastore's complaints of pain, shortness of breath, fatigue and weakness were not supported by medical evidence or observations of examiners.  The medical expert reported Mr. Pastore's cardiac condition had been normal since 2001.  Moreover, while Dr. Conran observed in July of 2005 that Mr. Pastore was noticeably short of breath, in June of 2005 Dr. Velis noted that his lungs were clear with good air entry, with no rhonci, and no wheezing.  Mr. Pastore described limited daily activities, but the ALJ did not give these allegations much weight because they could not be objectively verified to "any reasonable degree of certainty."  AR at 28.  Further, the ALJ discounted Mr. Pastore's testimony because the record did not show that he persistently attempted to relieve symptoms by increasing medications, trying new treatment modalities, and consulting with specialists or new doctors.

Next, the ALJ discounted "several of the State Agency [physician] opinions" because they "were rendered without the benefit of much evidence added to the record since their assessments, so those assessments (Exhibit 4 F ) no longer have probative value."  AR 28. However, the more recent residual functional capacity assessments made by non-examining physicians were given "great weight" because they were generally consistent with the opinion of the medical expert.  In contrast, the ALJ rejected Dr. Bhagwakar's opinion as conclusory and contradictory because he appeared to accept Mr. Pastore's complaints and "provided no evidence

or diagnoses supporting his conclusions." *Id*.   The ALJ also found that Mr. Pastore had a high school education with transferable skills, and even if his education was considered limited, his decision would not change.

In the formal findings section of his decision, the ALJ applied the five-step sequential evaluation for determining disability under the Social Security Act and found at step one that Mr. Pastore had not engaged in substantial gainful activity since his alleged onset of disability, September 21, 2002.  *See* 20 C.F.R. § 404.1520.  At step two, the ALJ concluded that Mr. Pastore's impairments of history of coronary artery disease, sleep apnea, depression, and anxiety were "severe" within the meaning of the regulations, but concluded at step three that these impairments did not singly or in combination meet or equal a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1.

The ALJ also rejected Mr. Pastore's allegations regarding his subjective symptoms and functional limitations based on his finding that Mr. Pastore's testimony was not credible.  The ALJ then concluded that Mr. Pastore had the residual functional capacity ("RFC" – *i.e.*, what he could do despite his limitations, 20 C.F.R. § 404.1545) for medium work, which involved occasionally lifting 50 pounds and frequently lifting 25 pounds, and standing/walking for about 6 hours in an 8-hour day, but he could never climb ladders, ropes, or scaffolds, and could only occasionally climb ramps and stairs, stoop, balance, kneel, crouch, and crawl. Although Mr. Pastore could not perform his past work given his RFC (step four), the ALJ found at step five, based on vocational expert testimony, that he had a high school education and transferable skills which allowed him to perform medium and light semi-skilled jobs as an auto service writer, parts

counter person, or as an auto technician which exist in significant numbers in the national economy.

## III. ANALYSIS

### A. Standard of Review

In reviewing the Commissioner's decision, we are obliged to review all of the evidence in the record. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1985). Judicial review of the Commissioner's final decision is governed by 42 U.S.C. § 405(g) which provides that "the findings of the commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ." Thus, a reviewing court may not decide the facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Delgado*, 782 F.2d at 82.

Instead, judicial review is limited to determining whether the ALJ applied the correct legal standards in reaching a decision and whether there is substantial evidence in the record to support the findings. 42 U.S.C. § 405(g); *see also Scivally v. Sullivan*, 966 F.2d 1070, 1075 (7th Cir. 1992). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The ALJ's decision must be affirmed if the findings and inferences reasonably drawn from the record are supported by substantial evidence, even though some evidence may also support the claimant's argument. 42 U.S.C. § 405(g). A credibility determination made by the ALJ will not be disturbed unless it is patently wrong. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). The ALJ's conclusions of law, however, are not entitled to such deference. If the ALJ committed an

error of law, "reversal is required without regard to the volume of the evidence in support of the factual findings." *Imani v. Heckler*, 797 F.2d 508, 510 (7th Cir. 1986).

### B.    Mr. Pastore's Contentions

It is undisputed that a five-step inquiry outlined in the Social Security regulations determines disability status. 20 C.F.R. § 404.1520(a)–(g). The Commissioner must decide sequentially: (1) whether the claimant is currently employed; (2) whether he has a severe impairment; (3) whether his impairment(s) meets or equals any impairments listed by the Commissioner as conclusively disabling; (4) whether the claimant can perform his past work; and if not, (5) whether the claimant is capable of performing any work in the national economy. *Id*. If the Commissioner does not find the claimant's severe impairment(s) to be conclusively disabling at step three, the Commissioner must assess and make a finding about the claimant's RFC, which is used at steps four and five. 20 C.F.R. § 1520(e). While the claimant bears the burden of proof at steps one through four, the burden shifts to the Commissioner at step five. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). Here, the ALJ found that Mr. Pastore was not disabled and could perform work in the national economy.

Mr. Pastore makes 6 principal arguments: (1) the ALJ ignored Dr. Gries' opinion and failed to apply 20 C.F.R. § 414.1527(d); (2) the ALJ improperly evaluated and credited the non-examining physicians' opinions; (3) the ALJ ignored or mischaracterized medical evidence and thus did not build an accurate and logical bridge from the evidence to his conclusions; (4) the ALJ erred by not applying the special technique analysis for mental impairments; (5) the ALJ improperly assessed Mr. Pastore's credibility and failed to credit the psychological aspects of his

alleged pain; and (6) the ALJ did not identify specific transferrable skills or properly determine Mr. Pastore's educational level.

### 1.    Dr. Gries

The parties agree that the ALJ's opinion does not address the opinion of Dr. Gries, who was a treating physician, despite the fact that he was required to consider and evaluate all medical opinions, including those of treating physicians, and give reasons for the weight assigned to such opinions. 20 C.F.R. § 404.1527(d); *Groves v. Apfel*, 148 F.3d 809, 811 (7th Cir. 1998) (reversing where ALJ did not address treating physician's opinion that an impairment met a listing). The Commissioner contends that any error is harmless because the ALJ relied on the opinion of Dr. Kim, a state agency physician who expressly considered and rejected Dr. Gries' opinion, citing to *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). In that case, the Seventh Circuit held that a "remand for explicit consideration of Skarbek's obesity would not affect the outcome of the case where "the ALJ adopted the limitations suggested by the specialists and reviewing doctors who were aware of Skarbek's obesity."

A treating physician is any physician who "has provided [the claimant] with medical treatment or evaluation and who has or has had an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1502. Under the "treating source" rule:

> [M]ore weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances. A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well-supported by medical findings and not inconsistent with other substantial evidence in the record. A claimant, however, is not entitled to disability benefits simply because a physician finds that the claimant is 'disabled' or unable to work.' Under the Social Security regulations, the Commissioner is charged with determining the ultimate issue of disability."

*Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) (citations omitted).  *see also* 20 C.F.R. § 404.1527(d)(1) & (2).

Medical opinions from treating sources are granted this deference because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."  20 C.F.R. § 404.1527(d)(2).  Thus, the regulations provide that, "[i]f we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight."  *Id*.

When the Commissioner does not give controlling weight to the treating source's opinion, a detailed explanation of the reasons why this opinion was discredited is required.  *Id.* The Commissioner is required to examine factors such as the length of the treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the evidence which supports the opinion, the opinion's consistency, and the physician's specialization.  20 C.F.R. § 1527(d)(2)-(6).

Here, the back door consideration of Dr. Gries' opinion via Dr. Kim's opinion is insufficient because the ALJ's decision to accept a non-treating physician's summary and unexplained dismissal of a treating physician's opinion is not the equivalent of analyzing Dr. Gries' opinion independently and assessing its weight.  *See* 20 C.F.R. Section 404.1527(d) ("We will always give good reasons in our notice of determination or

decision for the weight we give your treating source's opinion" and if the treating physician's opinion is not entitled to controlling weight, it will be weighted based on the length and frequency of the treatment relationship, the frequency of examination, and the nature and extent of the treatment relationship).  This is especially true given that Dr. Gries diagnosed Mr. Pastore with sleep apnea, which the ALJ found was a severe impairment, yet Dr. Kim's report fails to provide any sort of meaningful analysis of this condition.  *See* AR at 570-71 (explaining disagreement with the treating source's conclusions by stating "RIF, less than sedentary RFC,; [sic] not supported by evidence in file" and noting "unremarkable clinical findings" and symptoms "atypical for angina").

The Commissioner states that the record does not contain other evidence consistent with Dr. Gries' conclusions so remand would be pointless.  However, the alleged lack of corroborating evidence is not a sound reason for jettisoning a treating physician's opinion entirely, especially when it is clear that the ALJ did not properly evaluate that opinion.  The Commissioner's remaining arguments are attempts to support the ALJ's ruling by marshaling arguments the ALJ did not consider.  The court is unwilling to conclude on this record that the ALJ's treatment of Dr. Gries opinion is harmless error, so this matter must be remanded so the ALJ can personally evaluate Dr. Gries' opinion using the proper standard.

## 2.     Non-Examining Physicians' Opinions

Next, Mr. Pastore contends that the ALJ also erred in giving "great weight" to the non-examining State Agency physician's opinions despite the fact that certain key aspects of the opinions were internally inconsistent.  In support, Mr. Pastore first stresses that the

ALJ accepted Dr. Kim's opinion that Mr. Pastore could lift 50 pounds, AR at 565, despite the fact that no other doctor found that Mr. Pastore could lift that much, AR. at 247A-50A, 425, 549. Moreover, the ALJ also accepted Dr. Cavenaugh's statement that he would not "argue" with Dr. Bhagwakar's finding that Mr. Pastore could lift less than 10 pounds occasionally and less than 5 pounds frequently. According to Mr. Pastore, the record does not support the 50 pound restriction and in any event, the ALJ erred in accepting both a 50 pound and a 10 pound restriction.

Second, Mr. Pastore notes that Dr. Cavenaugh's testimony, which was accepted by the ALJ, was also inconsistent because Dr. Cavenaugh testified that there was no evidence of any functional limitations in the record or any musculoskeletal diagnosis. Yet, according to Mr. Pastore, the record contains evidence of osteoporosis, degenerative joint disease of the knee and degenerative joint disease of L4-5, L5-S1, large endplate spurs throughout the lower lumbar spine, marked evidence of osteoporosis, and lacunar infarcts. Indeed, Dr. Cavenaugh reviewed Mr. Pastore's medical records and testified that medical evidence corroborated diagnoses of coronary artery disease with stents, sleep apnea, chronic anxiety with depression, panic attacks associated with shortness of breath, a sense of fatigue and a history of pain in the back and legs, X-rays revealed early degenerative disease of the right knee and degenerative disc disease at L4-5 and L5-S1, and there was also evidence of osteoporosis.

In response, the Commissioner contends that Dr. Cavenaugh's opinion was generally consistent with the medical evidence in the record, because despite evidence of

musculoskeletal and other conditions, the record did not show that these conditions led to functional limitations.

The court is troubled by the weight given to Dr. Cavenaugh's opinion given that it is questionable in two material respects. First, Mr. Pastore cannot be limited to lifting 50 pounds if he is also limited to lifting 10 pounds. The Commissioner contends that Dr. Cavenaugh's acceptance of both limitations is consistent because Dr. Cavenaugh was not asked to evaluate Dr. Bhagwakar's opinion. This semantic distinction is unconvincing, in that Mr. Pastore can only be subject to one lifting restriction, so Dr. Cavenaugh by definition cannot accept two definitions. *See Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) (the contrary opinion of a nonexamining physician, by itself, does not constitute substantial evidence to upset a treating or examining physician's opinion).

Second, Dr. Cavenaugh acknowledged that the medical evidence corroborated diagnoses of coronary artery disease with stents, sleep apnea, chronic anxiety with depression, panic attacks associated with shortness of breath, a sense of fatigue and a history of pain in the back and legs, X-rays revealed early degenerative disease of the right knee and degenerative disc disease, and there was also evidence of osteoporosis. Yet, Dr. Cavenagh also concluded that there was no evidence of significant functional limitation in the record due to heart, lung, or skeletal disease. It is true that an impairment may not necessarily rise to the level of a limitation on the ability to work. Nevertheless, given the extensive number of medical opinions backing up Mr. Pastore's view of the record, an explanation is required when giving very significant weight to a non-treating physician and rejecting the opinion of treating physicians. *See Skarbek v.*

*Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (an ALJ may discount a treating physician's opinion if it is inconsistent with a consulting physician's opinion or it is internally inconsistent "as long as he minimally articulates his reasons for crediting or rejecting evidence of disability"). The court thus concludes that the ALJ's reliance on Dr. Cavenaugh's testimony requires a remand.

### 3.    Did the ALJ Properly Consider all of the Medical Evidence?

Mr. Pastore next contends that the ALJ ignored or mischaracterized medical evidence and thus did not build an accurate and logical bridge from the evidence to his conclusions. Given that this case already is being remanded, the court will only briefly note its agreement with Mr. Pastore's points that multiple doctors diagnosed him with dyspnea (shortness of breath) but the ALJ relied on the opinion of a single doctor who did not personally observe Mr. Pastore experiencing shortness of breath. Similarly, the record showed that Mr. Pastore was unable to tolerate the C-PAP machine but the ALJ concluded that C-PAP treatment successfully resolved Mr. Pastore's sleep apnea. Given that Mr. Pastore consistently told his doctors that he could not use the C-PAP machine and this does not appear to be something he could control, the court declines to find that his inability to use the C-PAP machine is his fault and allow the ALJ to remove Mr. Pastrore's sleep apnea from consideration.

### 4.    The Special Technique Analysis for Mental Impairments

Mr. Pastore argues that the ALJ erred by not applying the special technique analysis for mental impairments. The special technique analysis requires an ALJ to evaluate the level of severity of a claimant's mental impairment at steps two and three of

the sequential evaluation by rating the claimant's limitations and restrictions in four functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3), *citing* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00C. These four functional areas correspond to the requirements of "paragraph B" of the Administration's mental impairment listings. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00, *et seq*.

The Commissioner concedes that the ALJ did not explicitly discuss the technique. Nevertheless, he asserts that the ALJ's decision shows that he sufficiently articulated his analysis of the evidence as it relates to Mr. Pastore's mental capacity. An ALJ sufficiently follows the special technique analysis if he evaluates the claimant's mental limitations under the "paragraph B" criteria in his opinion and he incorporates those assessments into his determination of the claimant's mental residual functional capacity. *Schmidt v. Astrue*, — F.3d —, 2007 WL 2255216, at *9 (7th Cir. Aug. 8, 2007). This occurred here.

The ALJ accepted the opinion of the state agency medical consultant (Dr. Pittman) in July 2005 that Mr. Pastore did not have a severe mental impairment because he had only mild limitations in daily activities, social functioning, and concentration, persistence and pace, and had no episodes of decompensation. Specifically, Dr. Pittman found that Mr. Pastore's main complaints were fatigue, diminished concentration and infrequent anxiety attacks, but he did not have a thought disorder or sad affect and was able to drive, leave home alone daily, be social, read, and attend church.

In deciding to accept Dr. Pittman's opinion, the ALJ noted that his conclusion was consistent with Dr. Peggau's July 2004 evaluation which gave Mr. Pastore a high GAF score of 90, as well as Dr. Bhagwakar's September 2005 evaluation in which he made normal mental status findings. The ALJ also considered the fact that Mr. Pastore was not receiving ongoing psychiatric treatment for anxiety or depression other than the use of Paxil or Effexor at times. The court finds that these findings sufficiently articulate a basis for finding that the evidence as a whole did not support work-related limitations caused by a mental impairment and adequately document the ALJ's application of the special technique and the degree of limitation experienced by Mr. Pastore in each of the functional areas. *See* 20 C.F.R. § 404.1520a(e). Thus, the court finds that the ALJ's mental residual functional capacity determination is supported by substantial evidence.

### 5. Mr. Pastore's Credibility

Next, Mr. Pastore asserts that the ALJ improperly assessed his credibility and failed to credit the psychological aspects of his alleged pain. The fact that the ALJ credited medical evidence in the record and did not reject that evidence based on Mr. Pastore's testimony does not demonstrate that the ALJ committed reversible error. *See* 20 C.F.R. §§ 404.1529(c)(3)-(4) (the ALJ must consider medical evidence as well as subjective factors). Mr. Pastore, however, also notes that the ALJ specifically did not credit his testimony, at least in part, because his "allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty." AR at 28.

The court agrees with Mr. Pastore that a determination of credibility has a subjective component and that the lack of objective verification does not automatically

call for rejection of a claimant's testimony in its entirety. Nevertheless, the ALJ did not ignore Mr. Pastore's testimony because it conflicted with medical evidence in the record. Instead, he balanced Mr. Pastore's subjective assessment of his capabilities against some of the medical evidence in the record. The problem with this is that he did not specifically address other medical evidence in the record which was consistent with Mr. Pastore's testimony.

An ALJ must examine evidence favoring and disfavoring the claimant, so the failure to discuss the medical evidence supporting Mr. Pastore's testimony and weigh it against the other evidence in the record necessitates a remand. *See Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001) ("we are unable to tell whether the ALJ investigated 'all avenues' that relate to [the claimant's] complaints of pain because her decision offers no clue as to whether she examined the full range of medical evidence as it relates to his claim"). Because this did not occur, the court cannot accept the ALJ's wholesale rejection of Mr. Pastore's testimony.

### 6. Mr. Pastore's Transferrable Skills and Educational Level

The Commissioner asserts that the ALJ found that Mr. Pastore had the equivalent of a high school education because of his training in mechanics. Mr. Pastore, however, correctly notes that the ALJ actually stated that Mr. Pastore "is considered to have a high school (or high school equivalent) education and he has transferable skills from skilled work previously performed" and even if he had a limited education, "that would not change the result of this decision."

The record shows that Mr. Pastore was schooled in Italy through the eighth grade, which is a limited education. 20 C.F.R. § 404.1564(b)(2-3). According to Ms. Tucker, a high school diploma is required for work as a service writer, estimator and parts counter employee. Thus, it appears that even if Mr. Pastore's educational level is higher than the eighth grade due to his work history, the lack of a high school diploma (or presumably the equivalent) would preclude him from securing employment as a service writer, estimator or parts counter employee.

Ms. Tucker testified that Mr. Pastore's past relevant work as a mechanic would be classified as skilled, and that he had acquired transferable skills "as far as mechanics and repairs of transmissions and thing like that." AR at 628. Transferrable skills acquired as a result of working as a mechanic do not have an obvious correlation to the skills necessary to work as a service writer, estimator or parts counter employee. Moreover, the ALJ did not provide any explanation as to why Mr. Pastore's eighth grade education in Italy and his career working as a mechanic would give him a skill level equal to that of a high school graduate in terms of the reasoning, arithmetic, and language skills required to perform the jobs of service writer, estimator or parts counter employee. *See* 20 C.F.R. § 404.1564(b)(3) ("Limited education means ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs. We generally consider that a 7th grade through the 11th grade level of formal education is a limited education"). Accordingly, the court finds that the ALJ's assessment of Mr. Pastore's educational level was not reasonable.

## IV.  CONCLUSION

For the foregoing reasons, the Commissioner's decision is reversed and the case is remanded for further proceedings consistent with this order.


DATE:    September 27, 2007

_____
Blanche M. Manning
United States District Judge